UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| ERIC McMURTRY, #373048, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:06-cv-2 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner through retained counsel pursuant to 28 U.S.C. § 2254.  On May 3, 2001, a Montcalm County jury found petitioner guilty of first-degree murder, conspiracy to commit first-degree murder, felony murder, and first-degree home invasion.  The victim, Howard Ringleka was killed on December 4, 1999.  He died after receiving multiple ax blows to the head.  Police recovered the murder weapon in the driveway of Mr. Ringleka's home.  Carla Ringleka, the victim's wife, and Jerome Gass testified against petitioner pursuant to plea bargains.  Petitioner elected to testify in his own defense.  Petitioner admitted that he had been present at the Ringlekas' house on the night Howard Ringleka was killed.  The jury found that petitioner guilty of conspiring with others to kill Mr. Ringleka and of committing the murder.  On July 13, 2001, petitioner was sentenced to mandatory life imprisonment on his first-degree murder conviction,[1] MICH. COMP. LAWS § 750.316, and 50-to-80 years' imprisonment on his conspiracy to commit murder conviction, MICH. COMP. LAWS § 750.157a, enhanced by petitioner's status as a habitual offender, fourth felony offense.

_____

[1] Petitioner's murder convictions on alternative theories were combined into a single non-parolable life sentence, as required by state law.  (Sentencing Transcript at 4-6, docket # 23).

Petitioner argues that he is entitled to federal habeas corpus relief on the following grounds:

I.  WAS PETITIONER DENIED HIS STATE[2] AND FEDERAL CONSTITUTIONAL RIGHT TO CONFRONTATION AND A FAIR TRIAL WHEN THE TRIAL COURT DENIED HIS MOTION TO SUPPRESS THE STATEMENT OF WELDON MOSBY AND PETITIONER'S TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE[]?

II.  WERE PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS VIOLATED DUE TO THE INEFFECTIVENESS OF SUBSTITUTE TRIAL COUNSEL AT THE PRETRIAL HEARING ON PETITIONER'S MOTION TO SUPPRESS WHERE COUNSEL WAS UNPREPARED AND GAVE LITTLE ARGUMENT ON THE MOST CRUCIAL ISSUE OF PETITIONER'S CASE?

III.  WERE PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS VIOLATED WHEN HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO MOVE FOR A CHANGE OF VENUE OR AT THE VERY LEAST TO ENSURE THAT NO MEMBERS OF THE JURY HAD READ ABOUT THE CASE IN THE NEWSPAPERS[]?

IV.  WERE DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS VIOLATED WHEN THE PROSECUTOR IMPROPERLY BOLSTERED THE TESTIMONY OF CARLA RINGLEKA[]?

V.  WERE PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS VIOLATED WHEN THE PROSECUTOR REPEATEDLY MISCHARACTERIZED THE EVIDENCE IN HER CLOSING ARGUMENT AND IMPROPERLY BOLSTERED THE TESTIMONY OF HER [sic]?

VI.  DID THE CUMULATIVE EFFECT OF THE ERRORS SET FORTH IN THIS BRIEF DENY THE DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR [TRIAL]?

(Petitioner's Brief at ix-x, docket # 2).  Respondent asserts that all six grounds raised by petitioner are

barred by procedural defaults, and alternatively, that all grounds raised by petitioner are meritless.  (Answer

to Petition for Habeas Corpus, docket # 12)  Petitioner contends that the grounds raised are not barred by

procedural default.  (Reply Brief at 1-3, docket # 32).  Upon review, I find that all grounds raised in the

_____

[2] Alleged violations of state law do not provide a basis for federal habeas corpus relief.  28 U.S.C. § 2254(a); *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Therefore all petitioner's arguments claiming violations of his rights under Michigan's constitution have been disregarded.

petition are barred by procedural default, not overcome by a showing of cause and prejudice or actual innocence, and alternatively that all grounds raised by petitioner are meritless.  Accordingly, I recommend that the petition be denied.

### **Proposed Findings of Fact**

I.     **Pretrial Proceedings**

     A.     <u>Montcalm County District Court</u>

On November 10, 2000, petitioner and co-defendant Jerome Gass received a preliminary examination hearing in Montcalm County District Court.  (Preliminary Examination (PE), docket # 16). Carla Ringleka testified at the hearing regarding her affair with Weldon Mosby and their multiple attempts to kill her husband, Howard Ringleka.  She testified that she knew that her husband would be killed on the night of December 4, 1999.  Weldon Mosby had called her on his way back to Stanton, Michigan with the two "crack heads" that he had picked up in Detroit, who were willing to kill Howard Ringlaka for cash. When Mosby stopped at the video store that the Ringlekas' owned in order to pick up the cash from Carla, Mosby informed her that Howard Ringleka would be killed that night with an ax and that it would be made to look like a robbery.  Carla Ringleka also testified regarding the circumstances surrounding her arrest and the statement she gave to police.  (PE, 15-40).

Detective Joe Patino of the Montcalm County Sheriff's Department testified regarding the circumstances surrounding the statements he obtained from Carla Ringleka, Weldon Mosby, Jerome Gass, and petitioner regarding the killing of Howard Ringleka. (PE, 41-59, 91-93, 102-03, 105-28).

Before the preliminary examination hearing, petitioner's counsel, Charles W. Simon III, had filed a brief in support of a motion to exclude the taped statement that Weldon Mosby had given to

authorities[3] on grounds that it was not admissible under the Michigan Rules of Evidence and the Sixth

Amendment's Confrontation Clause.  (PE, 66).  During the hearing, the court heard extensive argument

regarding the admissibility of Mosby's statement.  (PE, 59-82).  It was undisputed that Weldon Mosby was

unavailable,[4] and the argument focused on whether Mosby's statement fell within a firmly rooted hearsay

exception and whether it was sufficiently reliable to be admitted under the Sixth Amendment standards

enunciated by the Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) and its progeny.  A series of

decisions by the Michigan Supreme Court and Michigan Court of Appeals applying the federal

constitutional standards were also discussed.  *See People v. Poole*, 506 N.W.2d 505, 511-12 (Mich. 1993);

*People v. Lee*, 622 N.W.2d 71 (Mich. Ct. App. 2000); *People v. Petros*, 499 N.W.2d 784, 788-92 (Mich.

Ct. App. 1993)[5].  Judge Raymond P. Voet found that Weldon Mosby's statement, which placed Mosby in

the middle of the conspiracy to kill Howard Ringleka, including several failed attempts to kill Mr. Ringleka

before Weldon Mosby's December 4, 1999 recruitment, transportation, providing of the murder weapon,

and payment of petitioner and Jerome Gass for killing Howard Ringleka, carried sufficient circumstantial

guarantees of trustworthiness to allow admission of Mosby's statement:

> Mr. Mosby apparently stated and Ms. Ringleka supports that, that there was this conspiracy leading
> up to Mr. Ringleka's death on December 4th of 1999.  That they fully participated in the
> conspiracy.  That there is no question they wanted Mr. Ringleka dead and even made some meager
> efforts to kill Mr. Ringleka including poisoning [] mashed potatoes with sleeping pills, heroin and
> at some point the purported idea of using a gun that was apparently in existence and going to be
> used.  Ultimately, the axe murder takes place.  There's no dispute about that -- that's clear evidence

---

[3]A transcript of Weldon Mosby's December 17, 1999 statement to the police is attached to the preliminary examination hearing transcript.  (docket # 16, Attachment).

[4]Weldon Mosby was tried and convicted of first-degree murder before petitioner's preliminary examination hearing.  (PE, 57).

[5] During the preliminary examination hearing there was limited discussion of a then-recent decision by Judge Simon of the Montcalm County Circuit Court, *People v. Schutte*.  (PE, 65-66).

here, and apparently the suggestion is, is that two crack heads were recruited and that Misters McMurtry and Gass I presume are going to be those people who were recruited for that.  The statement . . .  was made by Mr. Mosby certainly could be construed or interpreted as minimizing his involvement in that he's saying that he didn't wield the axe, in and of itself could trip this case, I think, that way in saying that Mr. Mosby didn't do it.  But considering the way the law has evolved here, much in the way we've seen other areas evolve and change, for example, the *Vandvliet* and 404(b) area has changed dramatically in the last 10 to 15 years.  I look at the evolution per *Poole*, *Petros*, *Lee* and [] most recently *Schutte* here in Montcalm County.  The bottom line, the goal, on a case by case [basis] for the trier of fact, this court, is to make assessments as to reliability.  When I look to the fact that there's clearly a conspiracy and there [were] clearly steps taken by Mr. Mosby and Ms. Ringleka to try to effectuate the death of Mr. Ringleka, the poisoning attempts by way of sleeping pills and by way of heroin and then ultimately picking up a gun by Mr. Mosby, and I look at that, it -- it makes sense.  Just good common human plain sense to me that if Mr. Mosby couldn't pull the trigger, didn't have the guts to do it frankly, that he needed the help or assistance of other people and so with that in mind, it -- it basically touches my sense of common sense inside me that it's reliable if he says that [he] had to recruit other people and have them do it, have them do this bloody dirty work, frankly.

(PE, 85-87).  Mosby's statement was transcribed and made an exhibit to the preliminary examination transcript so that it would be part of the written record available for the circuit court judge to review, and for any future appellate review.  (PE, 88).

Petitioner's counsel also objected to admission of Jerome Gass's statement on Confrontation Clause grounds.  (PE, 97-98).  The prosecutor stipulated that Gass's statement was not being offered against petitioner.  It was only being offered as evidence against Jerome Gass.  (PE, 98).  Judge Voet limited his consideration of Gass's statement to the question of whether Gass should be bound over for trial.  (PE, 109).  Detective Patino testified regarding the circumstances surrounding petitioner's own statement to the police.  (PE, 114-19, 123-27).  At the conclusion of the preliminary examination hearing, petitioner and Jerome Gass were bound over for trial on all four charges: open murder, felony murder, conspiracy to commit murder, and first-degree home invasion.  (PE, 137).  Thereafter, Jerome Gass entered into a plea bargain and agreed to testify against petitioner.

B.   Montcalm County Circuit Court

Petitioner was represented by Attorney James D. O'Connell in Montcalm County Circuit Court proceedings.  In March of 2001, defense counsel filed a motion and supporting brief to suppress Weldon Mosby's statement and to overturn petitioner's bindover for trial.  (Montcalm County Circuit Court docket sheet, docket # 15).  On April 16, 2001, the court conducted a hearing on petitioner's motions.  (4/16/2001 Hearing Transcript (HT), docket # 17).  Attorney Charles Novelli represented petitioner at this hearing with petitioner's consent.  It was undisputed that Welson Mosby was rendered unavailable by exercise of his Fifth Amendment rights and his pursuit of an appeal of his first-degree murder conviction.  Attorney Novelli argued that the Information against petitioner should be quashed and that Mosby's statement to the police should be suppressed because the statement lacked the necessary circumstantial guarantees of trustworthiness to be admitted into evidence against petitioner. (HT 3-6).  Judge Charles H. Meil, having heard oral argument and having reviewed the preliminary examination transcript, Mosby's statement, the briefs filed by the parties, and the applicable case law, denied petitioner's motion:

> The next question then becomes whether or not in this particular case, the Prosecutor doesn't overcome the presumption of unreliability of the statement because it clearly is a hearsay statement if admitted [in] this particular case.
>
> I do feel under Michigan Court Rule 504(B)(3) there are exceptions, obviously, to the Hearsay Rule and one of those is -- let me just state it, it's a declaration against penal interest of the person making the statement, Mr. Mosby in this particular case.  In looking at the briefs of the parties, the Court is relying on *People v Poole* which is 444 Mich 151, *People v Lee* 243 Mich App 163, *People v. Petros* which is 198 Mich App 401, *People v Beasley* which is 239 Mich App 548.  In analyzing those cases and what the Court really feels the law involved in this matter is, I do determine that this statement would be admissible under [5]04(B)(3) and I also don't feel it violates the defendant's Sixth Amendment rights of confrontation.  Although Mr. Mosby would not be available for cross examination, it is admissible because I think the statement does have indicia of reliability and trustworthiness.

-6-

The factors the Court is considering in that regard is, first of all, in reading the statement as a whole -- or looking at all the circumstances as a whole, I think the statement Mr. Mosby made is clearly against penal interest.  The statements made by him were part of his narrative to the police department and Detective Patino and Detective Corwin at the time.  His wife was present at the time.  He was given his *Miranda* warnings.  He didn't have to make a statement at all so I think all this indicates that it was a voluntary statement made by him at the time it was made.  It was supported by other evidence in the case regarding the ax being found at the scene and the testimony of Carla Ringleka of what took place.  I don't think there was any offer of leniency in the statement given to Mr. Mosby to induce the statement or make it untrustworthy.

His statement did somewhat try to shift responsibility to other people in the case but I don't think he exonerated himself in doing so.  It still subjected him to criminal responsibility to the extent that a reasonable person would have to say that the statement was true and made contemporaneously to the events involved.  It wasn't the day of the offense but it was done within a reasonable time and the Court feels it was contemporaneously made.  I think his statement was made December 17th and the homicide took place on December 4.

Basically to summarize, the Court feels based on the totality of the circumstances in this case, the statement has an inherent trustworthiness, a strong indicia of reliability and therefore, is admissible as substantive evidence against the defendant in this particular case.

Based on that I also feel that there's no abuse of discretion by the District Court Judge in binding the matter over and that statement was part of his ruling.

(HT, 14-15).  Judge Meil held that Weldon Mosby's statement had sufficient trustworthiness and indicia of reliability to be offered into evidence against petitioner.  (HT, 15).

## II.    Trial

Petitioner's jury trial began on April 30, 2001, and concluded on May 3, 2001, with the jury's verdict finding him guilty of first-degree murder, felony murder, conspiracy to commit murder, and first-degree home invasion.  (TT I - TT IV, docket #'s 18-22).  Attorney O'Connell represented petitioner during his trial.  On the opening day of trial, Attorney O'Connell renewed the motion to suppress Mosby's statement.  Judge Meil found no reason to alter his earlier ruling.  (TT I, 71, docket # 18).

The voir dire included questioning members of the venire to determine whether they had heard, read, or seen anything about the case that would impair their ability to render a fair and impartial verdict based solely on the evidence presented in court. (TT I, 4-64). After the last juror was seated, Judge Meil inquired whether there were any further challenges and received the following responses:

THE COURT:             Any challenges for cause Ms. Krause?

MS. KRAUSE:            None your Honor.

THE COURT:             Mr. O'Connell, any challenges for cause?

MR. O'CONNELL:    No your Honor.

THE COURT:             Any peremptory challenges, Ms. Krause?

MS. KRAUSE:            None.

THE COURT:             Mr. O'Connell, any peremptory challenges?

MR. O'CONNELL:    No, we are pleased with the jury your Honor.

(TT I, 64). Judge Meil gave his preliminary jury instructions. (TT I, 72-76). Prosecutor Andrea S. Krause and Attorney O'Connell delivered their opening statements without objections. (TT I, 76-90).

Witness testimony established that on the night of December 4, 1999, the victim, Howard Ringleka, was found lying face down on the bathroom floor of his home with a very large wound visible on the back of his skull. A large amount of Mr. Ringleka's brain matter was exposed. His blood was splattered on the floor and walls. (TT I, 93, 110-11, docket # 18). Howard Ringleka died from "Massive cerebral cranial trauma due to being struck on the head multiple times [with] an ax." (TT I, 121-22). A forensic pathologist testified that Mr. Ringleka suffered a minimum of six "chop wounds" to his head. (TT II, 54-55, 65, docket # 19). Five of the wounds were "devastating, and any one of them could have killed the victim." (TT II, 68). The force of the blows and their location were consistent with having been made

by an adult male swinging an ax.  (TT II, 56).  There were other chop wounds on the top of Mr. Ringleka's left shoulder, parts of his right shoulder, and in the middle of his back.  (TT II, 59).  The wounds found on the back of Mr. Ringleka's left hand and the parts of his fourth and fifth fingers were consistent with the victim's having attempted to defend himself from an ax blow being delivered from behind.  (TT II, 60).

Police recovered a large, double-bladed ax that had been left in the Ringlekas' driveway in front of the garage. (TT I, 93, 100, 105-06).  The ax had red fluid on it which turned out to be Howard Ringleka's blood.  (TT I, 94, 106, 112).  Witness testimony established that on April 24, 1999, Weldon Mosby had purchased an ax at Rolston Hardware in Stanton, Michigan.  (TT I, 148-50).  The Rolston Hardware store price sticker was still affixed to the ax police found at the Ringlekas' residence.  (TT I, 150-51; TT II, 77).

Police discovered that an empty deposit bag with the words "Show Time" written on it had been placed next to the victim's feet.  (TT I, 95).  Show Time was the name of the video rental store Howard and Carla Ringleka owned.  (TT I, 154-55).  Just outside the entrance to the bathroom a large black-handled knife stuck into the slats of a  door. (TT I,  95).  No blood was found on this knife.  (TT II, 94).

Jerome Gass acknowledged that he was testifying pursuant to a plea agreement.  Gass had faced the same charges as petitioner, but had been allowed to plead guilty to second-degree home invasion. (TT II, 118, 156, 164-65).  Jerome Gass identified petitioner in open court.  (TT II, 118).  Gass testified that he had known petitioner for approximately 4 years.  Gass lived on a lower floor of the same Detroit apartment as petitioner.  (TT II, 119).  Gass stated that the first time he met Weldon Mosby was on December 4, 1999.  (TT II, 120).

According to Gass, petitioner came down to Gass's apartment and indicated that he had a friend who had "some work to be done," and that if Gass and petitioner rode "up past Lansing" with him, the guy was going to buy them beer and cigarettes, and petitioner and Gass would be able to make some money. (TT II, 120-21). Gass testified that Weldon Mosby drove petitioner and him to a liquor store where Mosby supplied the money for the purchase of cigarettes, liquor, and two pairs of gloves (one for petitioner and one for Gass). (TT II, 121-23). The group made a stop in Ionia for gas and beer. (TT II, 124-25). Gass testified that Mosby made additional stops at a trailer park and at a pay phone. (TT II, 125-26). The last stop before the Ringleka residence was near a building that had a slanted roof like a restaurant. After that stop, Weldon Mosby returned to his car with some cash that Gass and petitioner split. (TT II, 126-27).

Gass testified that he fell asleep, but he woke up after Mosby's car had been backed up to a house. (TT II, 128). The car's trunk was open and Mosby was seated on its edge. (TT II, 129). When Gass asked Mosby regarding petitioner's whereabouts, Mosby indicated that petitioner was inside the house. (TT II, 129-30). Gass put on his gloves and went indoors holding the black-handled knife in his hand. (TT II, 130-32). Gass testified that as he went inside he heard thumping noises. (TT II, 132, 135). He saw petitioner standing over Mr. Ringleka, swinging something down and hitting the upper part of Howard Ringleka's body. (TT II, 136-37). Gass testified that he stuck his knife into the door slats and grabbed petitioner with both hands. Petitioner refused to come with him. (TT II, 138). Gass testified that he saw petitioner hit Howard Ringleka four times, and heard petitioner hit Mr. Ringleka at least three more times. (TT II, 139). Gass went back outside and he saw Mosby putting things into the trunk of his car. (TT II, 138). Gass testified that he and Mosby saw car headlights approaching. Mosby went back inside and retrieved petitioner and the two of them quickly put more things into the trunk. (TT II, 138). It was

later determined that guns had been taken from a cabinet in the Ringlekas' bedroom. (TT I, 145-46).  A two-deck VCR, a standard VCR, and shotgun shells were among the other items taken.

   Gass testified that Mosby was driving as they fled the scene.  Petitioner was in the passenger seat and Gass was in the back seat.  (TT II, 139).  No blood was found in the driver's area of Mosby's 1993 Grand Prix.  Blood was found on the right front passenger door carpet near the bottom of the door, right front passenger door grip, left rear passenger door handle, left rear carpet floor, and right rear floor of the car.  (TT II, 95-96).  DNA tests showed that it was Howard Ringleka's blood.  (TT II, 109-111).  The prosecution's expert testified that a genetic match  would be expected to occur "once in every 55.1 trillion people in the Caucasian population."  (TT II, 113-14).

   Carla Ringleka testified that she had entered into a plea agreement which had allowed her to plead guilty to second degree murder.  (TT I, 172-73).  She testified that Howard Ringleka was her husband.  She had met Welson Mosby in January of 1999 at the Show Time video store.  (TT I, 153-54).  Carla Ringleka began having an affair with Mosby in March of 1999.  Carla Ringleka and Weldon Mosby began discussing how to kill Howard Ringleka.  (TT  I, 156).  Mrs. Ringleka claimed that it had been Mosby's idea to kill Mr. Ringleka.  (TT I, 158).  Carla Ringleka admitted that she had personally been involved in several previous attempts to kill Howard Ringlaka.  For example, in late November of 1999, Carla Ringleka obtained some prescription sleeping pills from her doctor.  (TT I, 188).  She laced Mr. Ringleka's mashed potatoes with the contents of those sleeping pills.  (TT I, 159, 178).  Mr. Ringleka refused to eat the mashed potatoes because they had a strange taste.  (TT I, 160).  In December 1999, Carla Ringleka gave Mosby $150 for the purchase of some heroin.  (TT I, 158).  Mosby dumped the heroin into a pan of pudding that she was  preparing for her husband.  (TT I, 159).  Howard Ringleka ate the pudding and fell asleep.  Mosby obtained a sawed-off shotgun from a gun cabinet in the Riglekas' bedroom and told

Carla Ringleka to go to the other end of the house.  (TT I, 161).  Mosby later rejoined Carla Ringleka and reported that he couldn't use the shotgun because she was in the house.  (TT I, 161).

Carla Ringleka testified that after the failed attempt to kill her husband with heroin she was concerned that Howard might go to the doctor and have a blood test, which would reveal the presence of heroin.  (TT I, 191).  She and Mosby discussed the possibility of getting a couple of "crack heads" to kill Howard.  (TT I, 158).  The plan was to make the murder look like a robbery.  (TT I, 171).  Carla Ringleka testified that on the night of Saturday, December 4, 1999, she received two telephone calls from Weldon Mosby.  Mosby had indicated in his first call that he couldn't find two crack heads.  Later, Mosby called Carla Ringleka back and stated that he had found two crack heads in Detroit who were willing to help them kill Howard Ringleka and that the three of them were on their way.  (TT I, 162).

Carla Ringleka estimated that Weldon  Mosby arrived at the Show Time video store a little after 10 p.m.  Mosby asked Carla Ringleka for $1000 to pay the two men he had hired to kill Howard Ringleka.  Carla Ringleka gave Mosby the $400 that she had on hand at the video store.  Mosby advised her that Howard Ringleka would be killed later that night with an ax and that it would be made to look like a robbery.  (TT I, 163, 171, 192).  Carla Ringleka testified that she followed her normal Saturday night routine, which was to bring home food for Mr. Ringlaka to eat in conjunction with his 11 p.m. shot for his diabetes.  (TT I, 164).  She stopped at McDonald's before driving the six miles to their home.  As Carla Ringleka was entering the driveway, she saw the headlights from Mosby's car and stopped.  She saw at least one person leave her house (TT I, 194), and then she saw Mosby's car speed past her.  (TT I, 166).  Carla Ringleka parked her car and came indoors.  From the kitchen she could see that Mr. Ringleka's feet were protruding from the bathroom out into the hallway.  (TT I, 167).  She used a telephone in the basement to call 911.  (TTI, 168).  She attempted to feel for a pulse, as the 911 operator had instructed, and

then went outdoors and waited for the police to arrive.  (TT I, 169).  She testified that a double VCR and

a standard VCR were missing.  (TT I, 170).  A Video Time money bag that had contained approximately

$500 in cash was empty and guns and ammunition were missing.  (TT I, 170-71).

      During Carla Ringleka's direct examination, there was a brief exchange during which

Prosecutor Andrea Krause asked Carla Ringleka whether she had changed her story after making her plea

bargain:

> Q     You were in fact offered an agreement to testify today, correct?
>
> A     To testify for --
>
> Q     You were offered a plea bargain, you pled to something else than what you were originally charged with, is that fair to say then?
>
> A     Yes.
>
> Q     What did you plead guilty to?
>
> A     Second degree murder.
>
> Q     And that was again in exchange to testify in the other co-defendant trials, correct?
>
> A     Yes.
>
> Q     Before any plea bargain was offered to you, had you made your complete statement to Detective Patino?
>
> A     I think so.
>
> Q     After the agreement was offered to you, did you change anything or add anything to it?
>
>      MR. O'CONNELL: Your Honor, I'm going to object to that.  I don't think she can boot strap what she is saying here today by conversations she may have had with the police prior to that time while she was negotiating a deal.
>
>      THE COURT: Ms. Krause?

MS. KRAUSE: I'm simply asking her Judge, that if the -- the basis of my question is to find out whether the agreement induced her to say something other than what she originally told the police.

THE WITNESS: No.

THE COURT: Ms. Ringleka, let me resolve this first, then you can answer the question. I think the question was "what was your statement to the police?" Is that correct?

MS. KRAUSE: I asked her if she had made her whole statement to the police before any plea bargaining took place. If I wasn't clear, my question is did she change it because of the plea bargain in any way?

MR. O'CONNELL: I don't think she can do that.

THE COURT: I think it's a permissible question. I will overrule the objection. Go ahead.

Q     Did you change anything because of the plea bargain --

A     No.

Q     To try to make yourself look better or anything like that?

A     No, what I said was the truth, and what I knew.

(TT I, 172-74). The prosecutor did not elicit any further testimony from Carla Ringleka in this regard.

Upon cross-examination, Attorney O'Connell was able to elicit testimony from Carla Ringleka admitting that she had lied when she had been questioned by police at the crime scene. (TT I, 174). She lied when she told police that she did not know whose car she saw leaving her driveway. (TT I, 176). She testified that she had given Mosby the sawed-off shotgun when Howard had fallen asleep after being drugged with heroin-laced pudding. (TT I, 189). Defense counsel was also able to elicit testimony from Carla Ringleka that she knew that Weldon Mosby had been on parole. (TT I, 186). She denied threatening to have Mosby sent back to prison if he refused to help her kill Howard Ringleka. (TT I, 192).

-14-

Jerome Gass testified that petitioner and Mosby each thought the other had grabbed the ax as they rushed to leave the Ringlekas' house. (TT II, 136). Mosby expressed concern that if the ax was not in the trunk of his car that it could be traced back to him. (TT II, 140). Gass testified that after the three men left the house they stopped at a Ramada Inn near Lansing, Michigan. (TT II, 141). Gass did not have identification with him. The room was rented in petitioner's name. (TT II, 141). Mosby brought the items taken from the Ringlekas' residence into the motel room. Gass counted six firearms and at least one VCR. Mosby was emptying the trunk to determine whether the ax had been left behind. Petitioner and Mosby argued regarding who had been responsible for leaving the ax. Gass kept the stolen guns. Petitioner and Mosby put the other items back in the car and left the motel. (TT II, 143). Gass testified that he only stayed in the motel room for a very short time after petitioner and Mosby left. Gass testified that he was afraid to stay in the room because Mosby and petitioner knew that he was alone and what Gass had witnessed that night. Gass took the guns and hid them in a trench at a nearby construction site. (TT II, 143). He walked to a bus station and took a bus back to Detroit. (TT II, 145).

According to Gass, the next time he saw petitioner, petitioner related that Mosby's car had broken down on the way back to Detroit. Petitioner and Mosby had ended up pushing Mosby's car to a gas station. Mosby called his wife, Laura Mosby. Petitioner and Weldon Mosby waited at the gas station until Mrs. Mosby arrived. (TT II, 146).

On cross-examination, Attorney O'Connell elicited testimony from Jerome Gass that Mosby bought Gass all the beer he could drink. (TT II, 152). Gass admitted that he was later arrested on a charge of being a convicted felon in unlawful possession of a firearm. (TT II, 155). Attorney O'Connell cross-examined Gass at length about his plea bargain. (TT II, 159-61). Gass admitted that he knew that petitioner had made a statement about him to the police. Gass denied telling anyone at the county jail that

he hadn't seen petitioner do anything on the night Howard Ringleka was killed.  (TT II, 162).  Defense counsel was able to impeach Gass with his criminal history by getting Gass to testify as to his belief that he had been convicted of crimes involving theft or dishonesty.  (TT II, 163).

Bobbi Lake testified that Weldon Mosby had been living with her at Long Lake in a trailer park from October 1999 until his arrest on December 16, 1999.  (TT I, 124, 135).  Lake testified that approximately five days before Howard Ringleka was killed, she and Mosby had traveled together to Detroit.  (TT I, 125).  While they were in Detroit, Mosby had obtained a supply of heroin and asked Bobbi Lake to hide it in a film container.  (TT I, 126).

On Sunday, December 5, 1999, Weldon Mosby came to Bobbi Lake's house carrying a black garbage bag.  Lake testified that Laura Mosby, Weldon's wife, had been with him.  Mrs. Mosby waited outside while Weldon Mosby dropped off the black bag.  Weldon Mosby returned to Lake's trailer later that day, driving his wife's car.  (TT I, 127).  Bobbi Lake observed that the contents of the black bag included ammunition boxes.  Mosby related that the bag also contained a VCR.  Mosby wanted to get rid of the stuff inside the bag and Lake suggested that he take it and dump it somewhere.  (TT I, 129).  Bobbi Lake drove Mosby to the opposite side of Long Lake and stopped the car.  Mosby left the car with the bag and returned after emptying its contents.  (TT I, 129-30).  Lake later took the police to this location.  (TT I, 130).  Police divers recovered a dual-deck VCR, a standard VCR, and shotgun shells.  (TT I, 139-43). A serial number on one of the VCRs matched the serial number of a VCR reported stolen from the Ringlekas' residence.  (TT II, 7).

Ms. Lake testified that on Monday, December 6, 1999, she and Mosby went to a gas station off I-96 near Lansing, Michigan.  Mosby had left his car at this station.  While Mosby was attempting to

-16-

get the car started, Lake cleaned the interior of Mosby's car with Pine-Sol.  When she failed to clean the car to Mosby's satisfaction, he finished cleaning it himself.  (TT I, 131).

Detective Lieutenant Joe Patino of the Montcalm County Sheriff's Office testified that he had been the officer in charge at the crime scene on the night Howard Rignleka was killed. (TT II, 11). He testified that there were guns missing from the Ringleka residence.  (TT II, 12).  On December 17, 1999, Detective Patino took a statement from Weldon Mosby.  Laura Mosby, Detective Corwin, and Detective Patino were present during this interview.  (TT II, 13-14).  The recorded interview was never introduced into evidence against petitioner.[6]  Detective Patino testified that Mosby had described multiple attempts to kill Howard Ringleka: (1) with sleeping pills in his mashed potatoes; (2) with heroin in his pudding, followed by putting a shotgun to his head; and (3) by hiring two "crack heads" to do it.  (TT II, 15-18).  Mosby admitted that he had purchased an ax from Ralston's Hardware and that he left the ax at the Ringleka residence in the garage area.  (TT II, 16).  Mobsy indicated that Carla Ringleka had supplied the money to buy the heroin and pay the crack heads.  (TT II,  15-18).  Other than identifying petitioner in court (TT II, 13), Detective Patino made no mention of petitioner's name on direct examination.

Detective Patino testified that he took a statement from Carla Ringleka in which she admitted her involvement in the conspiracy to kill Howard Ringleka.  (TT II, 19).  He related that he had taken a statement from Jerome Gass.  Detective Patino testified that he had informed Gass that petitioner had given the police a statement which mentioned Gass's name numerous times and indicated that Gass had been involved in killing Howard Ringleka.  (TT II, 32-33).

---

[6]The jury never learned of Weldon Mosby's repeated statements to police identifying petitioner as the man who killed Howard Ringleka.  (Dec. 17, 1999 statement at 11, 17, 19, 40, docket # 16 attachment).  It did not learn of Mosby's statement that Eric McMurtry and his friend were wearing gloves, and that McMurtry was the man who was carrying the ax.  (*Id.* at 44-45).

-17-

Attorney O'Connell used his cross-examination of Detective Patino regarding the interview with Weldon Mosby as a means of attacking Carla Ringleka's credibility.  The jury learned that Weldon Mosby claimed that Carla Ringleka had threatened to accuse him of rape and have him sent back to prison if he didn't help her kill Howard Ringleka.  (TT II, 26).  Mosby had related that Carla Ringleka saw Howard as a financial burden and that the Ringlekas were $47,000 in debt.  (TT II, 26).  Mosby had indicated that Carla had discussed killing her diabetic husband with insulin in addition to the other methods previously mentioned.  (TT II, 27).  It was Carla who put the sleeping pills into the mashed potatoes and the heroin into the pudding.  (TT II, 29).  Mosby had claimed that on the night Howard Ringleka was killed, he had simply dropped off two men at the Ringlekas' residence and then came back and picked them up.  (TT II, 31).

Redirect examination of Detective Patino clarified that Mosby's story, as given to police, was that he had arranged the killing by being the driver and transporting the two crack heads to and from the Ringlekas' residence.  (TT II, 34).  Recross examination of Detective Patino established that Weldon Mosby and Carla Ringleka had each attempted to minimize their own involvement and shift the blame to the other for planning the murder of Howard Ringleka.  (TT II, 37).

An inmate from the Montcalm County jail, Joseph Houseman, was called as a witness for the defense.  (TT II, 171).  Houseman claimed that he had conversations at the jail with both petitioner and Jerome Gass.  Houseman claimed that Jerome Gass told him that Weldon Mosby "did the chopping," and that Gass planned to lie about petitioner and send him away for the rest of his life because petitioner had made a forty-nine page statement to the police that had mentioned Gass one hundred and ten times.  (TT II, 175).  Houseman testified that Gass told him that he was in the car and that Gass "didn't see or know nothing or do anything."  (TT II, 176).

-18-

Petitioner elected to take the stand in his own defense.  (TT II, 190, docket # 19).  Petitioner admitted being present at the Ringlekas' residence on the night of December 4, 1999, when Howard Ringleka was killed.  (TT II, 198).  Petitioner testified that he sat in Mosby's car.  (TT II, 198).  He saw Mosby get out of the car and retrieve something from the trunk before Mosby went inside.  (TT II, 198).  Petitioner testified that he later went "into the garage part of the house" and heard the sounds of fighting and someone yelling "no, no, stop[!]" (TT II, 200).  Petitioner testified that he heard Mosby saying, "I hate you, you big, white, fat, motherf_____."  (TT II, 200).  Petitioner claims that he yelled out to Mosby to "come on" and that he then went back into Mosby's car.  Petitioner testified that Mosby came out of the house and began putting things into the trunk.  (TT II, 202).  Petitioner denied ever seeing the ax.  (TT II, 200).  He denied ever seeing Howard Ringleka or hitting him with an ax.  (TT II, 201).  He testified that he saw the lights from another car stop near the end of the Ringlekas' driveway.  Mosby hurried up, got into the car, flashed its headlights, and drove away.  (TT II, 202-03).  Petitioner testified that he did not know what was in the trunk of the car until he, Gass, and Mosby arrived at the motel near Lansing.  (TT II, 206).  Mosby's car broke down near Fowlerville.  Laura Mobsy came to pick up Weldon and petitioner at the gas station.  Petitioner testified that Weldon Mosby drove Laura's car and gave him a ride home.  (TT II, 208).  Petitioner testified that he did not know that anyone had been killed until a later date when he was "arrested for some old tickets."  (TT II, 208).

Upon cross-examination, petitioner acknowledged that Weldon Mosby had paid him for helping Mosby locate the woman who had sold Mosby the heroin.  (TT III, 5, 7, docket # 21).  Petitioner testified that Mosby was his friend, and that Jerome Gass had never met Mosby before Saturday, December 4, 1999.  (TT III, 21).  Petitioner conceded that he was with Mosby and Gass at the victim's house on the night of December 4, 1999.  (TT III, 19- 21).  Petitioner insisted that he never went inside the Ringlekas'

-19-

house.  He testified that he got out of Mosby's car one time, and that the closest he came to going inside the house was going into the Ringlekas' garage.  (TT III, 19-20).

Cross-examination revealed that petitioner had modified his version of events to make it fit with the testimony that he had heard during his trial:

Q      Isn't it true that -- now you have given a statement to the police, correct?

A      Yes I have.

Q      You testified at a previous hearing under oath, correct?

A      Yes I have.

Q      You've testified during this trial under oath as well, correct?

A      Yes I have.

Q      Isn't it true that in your statement to the police, which was given back on January 20, 2000 --does that sound right?

A      Yes, I guess.

Q      That you told the police in your statement that you went to a video store first, then a trailer park, then the house?

A      I told them I wasn't quite sure, I didn't remember exactly which one was first.  That's what I told him.

Q      Would you agree that you told the police that it was video, trailer, house?

A      Yes.

Q      How about during your testimony under oath back on February 2000, you also said it was video, trailer, and then house?

A      Well, like I said, I didn't quite remember which -- in order which one it was.

-20-

Q     Do you agree though that's what you said under oath previously?

A     Yes.

Q     And then today, or during your trial, you changed it to trailer park, video store, and then the house?

A     Yes, that's because that's what I've been hearing.

Q     So you changed your testimony to conform to what you heard during this trial, is that true.

A     Yes, I guess.

(TT III, 14-15).

Petitioner was the last witness to testify before the close of proofs. As it turned out, the prosecutor made a strategic decision not to offer the recording or a transcript of Weldon Mosby's statement into evidence. Mosby's statement was never even marked as an exhibit during petitioner's trial. (TT III, 110).

On May 2, 2001, the attorneys delivered their closing arguments without objections. (TT III, 34-95). Defense counsel's closing argument continued the defense's theory that petitioner and Jerome Gass were the "fall guys" (TT III, 54-55, 68, 69, 79, 83) and responded to the arguments the prosecutor had made in her closing argument. Attorney O'Connell argued that Carla Ringleka and Weldon Mosby had long been scheming to kill Howard Ringleka, and part of their plan was to get Gass and petitioner drunk, leave them in the car, and have them available to take the blame for the killing of Howard Ringleka. (TT III, 79, 83). According to their plan, Mosby went in and killed Howard Ringleka with an ax and made the murder look like it had taken place during a robbery. Defense counsel argued that Jerome Gass was so desperate that he would have testified that petitioner shot Abraham Lincoln if Gass thought it would help him. (TT III, 75). Gass needed to make a deal with the prosecutor. He was very sick with a kidney

-21-

ailment and had been removed from the kidney transplant list.  Gass was attempting to make a deal to have

his prison sentences run concurrently rather than consecutively.  (TT III, 77, 80).  Gass was also blaming

petitioner because petitioner had repeatedly mentioned Gass in the statement petitioner gave to the police.

(TT III, 73).

Defense counsel argued that Weldon Mosby had been capable of swinging and ax and had

done so when he killed Howard Ringleka:

The Prosecutor said, Mosby had surgery.  Do you think he could have swung that ax.  She's
got to be kidding on that one.  Certainly he could have swung that ax.  Certainly, he could have and
certainly he did.  She said, did he all of a sudden develop courage, and he couldn't do it when Mr.
Ringleka was sleeping?  Maybe I want to believe her this time.  He said he couldn't do it because
she was in the house.  What reasons -- is this even a story they came up with the show  that they
really couldn't do it, and this dirty, bad guy did it, well they're really not so bad.  Well, it worked
for her.  She got a second-degree murder plea.  Is there any question -- she wasn't even tried.
Nobody was trying to convict her.  Is there any question that she was guilty of first-degree murder?
She's certainly admitted to it, and her friend did.  They wanted fall guys, and somebody to blame.

(TT III, 62).

The court delivered its jury instructions.  (TT III, 95-106, 111-20).  On May 3, 2001, the

jury returned its verdict finding petitioner guilty of first-degree premeditated murder, felony murder,

conspiracy to commit murder, and first-degree home invasion.  (TT IV, 3-4, docket # 22).  On July 13,

2001, petitioner was sentenced to mandatory life imprisonment on the first-degree murder conviction and

50-to-80 years' imprisonment on the conspiracy to murder conviction, enhanced by petitioner's status as

an habitual offender, fourth-felony offense.  (Pursuant to state law, the two theories of first-degree murder

were merged into a single count of conviction.)  (Sentencing Transcript, 5, docket # 23; Judgment of

Sentence Commitment to Corrections Department, found in Michigan Court of Appeals Record, docket

# 24).

III.    **Appellate Proceedings**

    A.    <u>Michigan Court of Appeals</u>

        Attorney William A. Van Eck represented petitioner in the Michigan Court of Appeals on his direct appeal of his criminal convictions.  The four issues raised by appellate counsel were as follows:

- Whether the trial court violated defendant-appellant's Sixth Amendment right to confrontation by admitting into evidence a tape recorded statement of a non-testifying co-defendant that implicated defendant-appellant in the murder of Howard Ringleka.

- Whether defendant-appellant's substitute attorney rendered ineffective assistance of counsel during the pretrial motion to suppress co-defendant Mosby's statement, where little, if any, argument was presented on the issue.

- Whether defendant-appellant was denied a fair trial by an impartial jury, where he was forced to defend himself against inflammatory charges that he brutally murdered a local businessman in a small community which was saturated with reports about the incident and whether defendant-appellant was denied the effective assistance of counsel where his attorney failed to move for a change of venue.

- Whether defendant-appellant was denied his due process right to a fair trial due to the prosecutor's improper bolstering of Carla Ringleka's credibility through reference to her prior consistent statement to police and the trial court's failure to sustain defense counsel's objection and render proper instructions to the jury to disregard that portion of the prosecutor's argument.

(Defendant-Appellant's Brief on Appeal at 6-7, Statement of Questions Involved, found in Michigan Court of Appeals record, docket # 24).  On January 21, 2003, the Michigan Court of Appeals issued an unpublished opinion upholding petitioner's convictions.

        The Michigan Court of Appeals began its analysis of the Confrontation Clause issue by observing that, "Contrary to defendant's argument, Mosby's entire taped statement was not admitted at trial." (Op. at 1, docket # 24).  "Rather, Detective Lieutenant Joe Patino, one of the officers who took Mosby's statement, [had] related portions of Mosby's statement" during Patino's trial testimony.  (*Id.* at 2).  The Court of Appeals found that the trial court had erred in permitting this testimony under Rule

804(b)(3) of the Michigan Rules of Evidence and that petitioner had been deprived of his constitutional right to confront Weldon Mosby. However, the Michigan Court of Appeals found that the error was harmless in light of the other evidence of petitioner's guilt, independent of Patino's testimony regarding Mosby's statement:

> Contrary to defendant's argument, Mosby's entire taped statement was not admitted at trial. Rather, Detective Lieutenant Joe Patino, one of the officers who took Mosby's statement, related portions of Mosby's statement during his testimony at trial. The trial court admitted the statements under MRE 804(b)(3), as a statement made against the declarant's own penal interest. Whether a statement is admissible under MRE 804(b)(3) depends on: (1) whether the declarant was unavailable, (2) whether the statement was against penal interest, and (3) whether a reasonable person in declarant's position would have believed the statement to be true. *People v Schutte*, 240 Mich App 713, 715-716; 613 NW2d 370 (2000), quoting *People v Barrero*, 451 Mich 261, 268; 547 NW2d 280 (1996). In a case where portions of the statement inculpate another, but are not directly against the declarant's interest, the statements are admissible as substantive evidence if the declarant's inculpation of an accomplice is made in the context of narrative events, the statement is made at the declarant's initiative without prompting or inquiry, and if the statement as a whole is clearly against the declarant's penal interest and as such is reliable. *People v Poole*, 444 Mich. 151, 161; 506 NW2d 505 (1993).

> In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability to allow it to be admitted as substantive evidence against another person without violating the defendant's constitutional right to confrontation, courts must evaluate the circumstances surrounding the making of the statement as well as the content. *Id.* at 165. The presence of the following factors would favor admission of the statement: "whether the statement was (1) voluntarily given, (2) made contemporaneously with the events reference, (3) made to family, friends or colleagues, ... that is to someone to whom the declarant would likely speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener." *Id.* Whereas, the presence of the following factors would favor a finding of inadmissibility: "whether the statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth." *Id.*

> Patino's testimony regarding Mosby's statement was inadmissible under MRE 804(b)(3) and its admission of the statement violated defendant's right to confrontation. Although Mosby's statement was made in the context of narrative events, was voluntary, and, as a whole was against his penal interests, it cannot be said the statement was made without any prompting or inquiry. The statement was made thirteen days after the victim was killed and was not uttered spontaneously to family or friends, but was made to law enforcement officers. The law enforcement officers

-24-

questioned, inquired, and prompted Mosby throughout the entire statement, and the statement could have been made to curry favor with law enforcement so Mosby could get some kind of deal. Moreover, Mosby, defendant, and a third accomplice all attempted to shift the blame to reduce their own culpability; therefore, Mosby's statement was not reliable. *Poole*, *supra* at 165. Consequently, the totality of the circumstances did not indicate that the statements were sufficiently reliable to allow their admission into evidence, and the admission of the statements deprived defendant of his constitutional right to confrontation.

However, although the trial court abused its discretion in admitting the evidence under MRE 804(b)(3) and deprived defendant of his constitutional right to confront Mosby, we find the error was harmless. An error in the admission of evidence is not a ground for setting aside a verdict or disturbing a judgment unless refusal to do so would be inconsistent with substantial justice or would result in a miscarriage of justice. MCL 769.26; MCR 2.613(A). In addition, a constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *People v Mass*, 464 Mich 615, 640 n 29; 628 NW2d 540 (2001). In light of the totality of the evidence presented at trial, the erroneous admission of Lieutenant Patino's testimony regarding Mosby's statement was not inconsistent with substantial justice and did not result in a miscarriage of justice. There was testimony from defendant himself and from Jerome Gass that established defendant's guilt independent of Patino's testimony of Mosby's statement. Because a rational jury would have found defendant guilty without the improperly admitted evidence, the constitutional error was harmless.

(Op. at 1-2).

The Michigan Court of Appeals rejected petitioner's claim of ineffective assistance of counsel during the circuit court hearing on petitioner's motion to suppress:

It was not objectively unreasonable for defense counsel not to orally argue the same arguments that had been written and presented very well in the brief. While defendant may have been unhappy with defense counsel's decision not to orally argue every point outlined in the brief, the defendant's evaluation of counsel's performance is irrelevant. Moreover, when claiming ineffective assistance due to counsel's unpreparedness, a defendant must show prejudice resulting from the alleged lack of preparation. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990). Although the trial court did err in admitting Mosby's statement through Lieutenant Patino's testimony, defendant has not shown that the trial court's error resulted from any omission on the part of defense counsel at the suppression hearing. Consequently, defendant has failed to overcome the presumption that defense counsel was effective. *People v Noble*, 238 Mich App 647, 661-662; 608 NW2d 123 (1999).

(Op. at 3).

The Court of Appeals held that defense counsel was not constitutionally ineffective in the decision not to move for a change of venue:

> Defendant next argues that he was denied a fair trial by an impartial jury because defense counsel failed to move for a change of venue. When the jury was empaneled, defense counsel asserted "we are pleased with the jury your Honor." Because defense counsel specifically affirmatively "expressly approved" and "clearly expressed satisfaction" with the jury, defendant has waived this issue on appeal. *People v Carter*, 462 Mich 206, 216, 219; 612 NW2d 144 (2000). However, to the extent defendant claims trial counsel was ineffective for failing to request a change of venue, we will address the issue.[7]
>
> According to defendant, a change of venue was necessary because he was tried after a coconspirator was tried in the same county and more than twenty newspaper articles about the case appeared in the local newspaper. Ordinarily, a defendant "must be tried in the county where the crime is committed"; however, "in special circumstances where justice demands or statute provides," the trial court may order a change of venue. *People v Jendrzejewski*, 455 Mich 495, 499; 566 NW2d 530 (1997). To determine if a defendant's trial was fundamentally unfair, the court must look at the totality of the circumstances, including whether media coverage remained "largely factual" or became "invidious or inflammatory." *Id.* at 502, 504, quoting *Murphy v Florida*, 421 US 794, 799-800; 95 S Ct 2031; 44 LEd2d 589 (1975). In addition to examining the pretrial publicity, the entire voir dire must also be examined to determine if an impartial jury was empaneled. *Jendrzejewski*, *supra* at 517.
>
> After reviewing the newspaper articles concerning the case, we conclude that they accurately and objectively related the events surrounding the victim's death and the subsequent investigation and trials. Furthermore, after reviewing the transcript in which the jury was selected, it is apparent that the pretrial publicity did not "saturate[ ]" the community so much that the "entire jury pool was tainted[.]" *Jendrzejewski*, *supra* at 500-501. In addition, in light of the fact that only six members of the jury venire affirmatively indicated that they were prejudiced, defendant has not demonstrated

---

[7]Although defendant did not request a change of venue, we note that there are two approaches for determining whether a trial court abused its discretion in denying a motion for change of venue because of concern regarding the defendant's ability to receive a fair trial:

> Community prejudice amounting to an actual bias has been found where there was extensive highly inflammatory pretrial publicity that saturated the community to such an extent that the entire jury pool was tainted, and much more infrequently, community bias has been implied from a high percentage of the venire who admit to a disqualifying prejudice. [*People v. Jendrzejewski*, 455 Mich 495, 499; 566 NW2d 530 (1997).].

(Op. at 2, n.2).

-26-

a "community bias" based on "a high percentage of the venire who admit to a disqualifying prejudice." *Id.* at 501. Further, those six were excused by the court.

* * *

Defense counsel was not ineffective in failing to move for a change of venue. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy. *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999). Furthermore, as indicated above, a motion for change of venue would not have been successful. Defense counsel is not required to make motions that have no merit. *People v Ish*, 252 Mich App 115, 118-119; 652 NW2d 257 (2002). Therefore, defendant has failed to show how he was prejudiced by defense counsel's alleged error in failing to move for a change of venue. *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000).

(Op. at 3-4).

The Court of Appeals held that there was no prosecutorial misconduct in eliciting a prior consistent statement from Carla Ringleka, because the prosecutor's question had been an attempt to elicit testimony to rebut a charge of improper motive:

Defendant finally argues that the prosecutor deprived him of a fair trial by improperly bolstering Carla Ringleka's testimony by asking her if her story changed after she entered into the plea agreement with the prosecutor. Evidence of a prior consistent statement of a witness is generally inadmissible as substantive evidence. *People v Washington*, 100 Mich App 628, 632; 300 NW2d 347 (1980). However, a prior statement of a witness is admissible to rebut a charge of improper motive. MRE 801(d)(1)(B). To be admissible under MRE 801(d)(1)(B), four elements must be established: (1) the declarant must testify at trial and be subject to cross-examination, (2) there must be an express or implied charge of recent fabrication or improper influence or motive or the declarant's testimony, (3) the prior consistent statement must be consistent with the declarant's challenged in-court testimony, and (4) the prior consistent statement must be made before the time that the alleged motive to falsify arose. *People v Jones*, 240 Mich App 704, 707; 613 NW2d 411 (2000).

In this case, evidence that Ringleka's story did not change after she was offered her plea agreement was properly admissible under MRE 801(d)(1)(B). *Jones, supra*. Defense counsel opened the door for the evidence by suggesting during opening argument that Ringleka was motivated to lie in order to get a plea agreement from the prosecutor. Prosecutorial misconduct cannot be premised on a good-faith effort to admit evidence. *Noble, supra* at 660. To the extent that the prosecutor's attempt to elicit evidence of Ringleka's prior consistent statement was admissible under MRE 801(d)(1)(B) and was in response to defense counsel's statements during opening argument, the prosecutor's conduct was not improper.

-27-

(Op. at 4-5).

      B.      <u>Michigan Supreme Court</u>

      Petitioner had fifty-six days, or until March 18, 2003, within which to file his application for leave to appeal to the Michigan Supreme Court. MICH CT. R. 7.302(C)(2). On February 14, 2003, Attorney Van Eck wrote a letter in response to a letter he had received from petitioner. Van Eck reminded petitioner that he did not represent him in connection with any discretionary appeal to the Michigan Supreme Court. (docket # 2, Appendix I). He urged petitioner to file his application for leave to appeal: "In review of your letter it appears that you should be filing an application for Leave to Appeal with the Michigan Supreme Court. . . . [W]e have not been appointed to represent you and you must continue to work towards filing it to preserve your rights." (*Id.*). Attorney Van Eck's February 25, 2003 letter stated, "I have received a verbal reply from Judge Meil's office regarding my request to be court appointed counsel to assist you in the process of your application for Leave to Appeal to the Michigan Supreme Court. Unfortunately, Judge Meil has denied my request. As I stated in my letter of February 14, I strongly recommend you continue to do this on your own to preserve your rights." (*Id.*). Petitioner waited until April 14, 2003 to file his application for leave to appeal, long after the March 18, 2003 deadline had expired. (docket # 2, Appendix B). On April 14, 2003, the Michigan Supreme Court rejected petitioner's untimely application for leave to appeal. (*Id.*; *see also* Affidavit of Corbin R. Davis, Clerk of the Michigan Supreme Court, docket # 25).

**IV.    Post-conviction Proceedings**

      A.    Montcalm County Circuit Court

On February 10, 2004, petitioner filed a motion in Montcalm County Circuit Court through retained counsel seeking relief from judgment under Mich. Ct. R. 6.500 *et seq*.  Petitioner raised seven issues:

(1).    Defendant was denied his state and federal constitutional rights to a fair trial when the trial court denied his motion to suppress the statement of Weldon Mosby and defendant's trial and appellate counsel were ineffective.

(2).    Defendant's state and federal constitutional rights were violated by ineffective assistance of substitute counsel at the pretrial hearing on defendant's motion to suppress where counsel was unprepared and gave little argument on the most crucial issue of defendant's case.

(3).    Defendant's state and federal constitutional rights were violated when he was denied the effective assistance of counsel by his attorney's failure to move for a change of venue or at the very least to ensure that members of the jury had not read about the case in the newspapers.

(4).    Defendant's state and federal constitutional rights were violated when the prosecutor improperly bolstered the testimony of Carla Ringleka.

(5).    Defendant's state and federal constitutional rights were violated when the prosecutor repeatedly mischaracterized the evidence in her closing argument and improperly bolstered the testimony of her witness Carla Ringleka.

(6).    A *Ginther* hearing was required to determine whether trial and appellate counsel had been ineffective.

(7).    The "cumulative effect" of the above-referenced errors denied defendant's state and federal constitutional rights to a fair trial.

On June 10, 2004, Judge Charles H. Meil entered its order denying petitioner's application for post-conviction relief.  Judge Meil observed that under Mich. Ct. R. 6.508(D)(2) the trial court could not grant relief on grounds already decided against petitioner on his direct appeal. (6/10/04 Op. at 1, found

in Michigan Supreme Court record, docket # 27).  The court held that Rule 6.508(d)(2) was a procedural bar to the court's consideration of the first four issues raised by petitioner and portions of his fifth and sixth issues.  The court rejected petitioner's claim of prosecutorial misconduct.  The portion of issue five repeating petitioner's argument that the prosecutor had improperly bolstered the testimony of Carla Ringleka was barred by Rule 6.508(d)(2).  (Op. at 4).  Judge Meil rejected petitioner's argument that the prosecutor had mischaracterized the evidence.  (Op. at 4-5).  He found no error in the prosecutor's closing argument that petitioner had tailored his testimony after listening to the testimony of other witnesses.  (Op. at 4) (citing *Portuonodo v. Agard*, 529 U.S. 61 (2000) and *People v Buckley*, 378 N.W.2d 432 (Mich. 1985)).  Further, Judge Meil noted that jurors had taken an oath that they would render a verdict only on the evidence introduced and would act in accordance with the instructions of the court.  (Op. at 5).  The jury had received instruction 2.5 of Michigan's Standard Criminal Jury Instructions 2d which directed the jury to decide the case only on the evidence admitted in the case and that evidence included only the sworn testimony of witnesses, exhibits and anything else the court instructed the jury to consider as evidence. The jury had been instructed that the lawyers' statements and arguments were not evidence.  (Op. at 5).

Judge Meil rejected petitioner's argument that a *Ginther* hearing was required.[8]  Rule 6.508(d)(2) barred petitioner's claims of ineffective assistance of trial counsel because they were the same issues that the Michigan Court of Appeals had rejected in petitioner's direct appeal.  Judge Meil held that

---

[8]Unlike the federal courts, the Michigan courts require criminal defendants to raise allegations of ineffective assistance of counsel on direct appeal.  If the grounds for the Sixth Amendment claim are not apparent in the record, the defendant is required to seek an evidentiary hearing after the entry of judgment in the trial court.  If the trial court does not grant an evidentiary hearing, a defendant must move in the Court of Appeals for a remand for purposes of an evidentiary hearing. *See People v. Ginther*, 212 N.W.2d 922, 925 (Mich. 1973).  Failure to seek a *Ginther* hearing ordinarily precludes review of the issue, unless the appellate record contains sufficient detail to support the defendant's claim. *See People v. Sabin*, 620 N.W.2d 19, 21-22 (Mich. Ct. App. 2000).

nothing in petitioner's motion for post-conviction relief indicated that appellate counsel had been ineffective.  He held that petitioner had not met his burden under Mich. Ct. R. 6.508(D)(3).  (Op. at 6) (citing *People v. Reed*, 535 N.W.2d 496 (Mich. 1995) and *People v. Brown*, 492 N.W.2d 770 (Mich. Ct. App. 1992)).

The trial court rejected petitioner's argument that the cumulative effect of the listed errors had deprived him of a fair trial.  Judge Meil wrote, "All of the issues raised here were either already ruled upon and not in favor of the Defendant or have no merit."  (Op. at 6).

**B.   Michigan Court of Appeals**

On September 28, 2004, through counsel, petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals.  The issues raised were generally the same as the grounds petitioner raises in his habeas corpus petition.  (Delayed Application for Leave to Appeal at 7-8, Statement of Questions Presented, found in Michigan Court of Appeals record, docket # 26).[9]  On April 7, 2005, the Michigan Court of Appeals entered an order denying petitioner's delayed application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (4/7/2005 Order, docket # 26).

**C.   Michigan Supreme Court**

On May 27, 2005, petitioner's counsel filed an application for leave to appeal to the Michigan Supreme Court raising the same issues presented in petitioner's delayed application for leave to appeal to the Michigan Court of Appeals.  (Application for Leave to Appeal at iv-v, Statement of

---

[9]Ground six in the delayed application for leave to appeal to the Michigan Court of Appeals was a claim that a *Ginther* hearing was required, a claim not raised in petitioner's habeas corpus petition.

Questions Presented, found in Michigan Supreme Court record, docket # 27).  On November 29, 2005, the Michigan Supreme Court issued its order denying petitioner's delayed application for leave to appeal because petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (Order, docket # 27).

Petitioner filed his habeas corpus petition through counsel on January 3, 2006.

## **Applicable Standards**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008).  "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009).  *De novo* review is restricted to instances where the state court did not address the merits of a claim.  In that limited set of circumstances,  "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, No. 07-2311, __ F.3d __, 2009 WL 454601, at * 3 (6th Cir. Feb. 25, 2009). A federal habeas court may

not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007).  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006)("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied*, 549 U.S. 1308 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.")(citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d).  This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009).  This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation.  "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed

to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003)(quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008).   Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see  Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004)(describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at  455).   "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'"  *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings.  28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008).  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008).

**Discussion**

Petitioner faces procedural bars to every ground raised in his habeas corpus petition. Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of a federal claim, unless the habeas petitioner can show "cause" for the procedural default and "prejudice attributable thereto." *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Federal courts "will not take up a question of federal law presented in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' The rule applies with equal force whether the state-law ground is substantive or procedural." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). In its decision in *Edwards v. Carpenter*, 529 U.S. 446 (2000), the Supreme Court emphasized the underlying purpose of the procedural default doctrine:

> The procedural default doctrine and its attendant "cause and prejudice standard" are grounded in concerns of comity and federalism, and apply alike whether the default in question occurred at trial, on appeal, or on state collateral attack. A habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. We therefore require a prisoner to demonstrate cause for his state court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim.

529 U.S. at 451 (internal quotations and citations omitted). The doctrine of procedural default is applicable where petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See Monzo v. Edwards*, 281 F.3d 568, 575-76 (6th Cir. 2002); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). The state may assert a procedural default when the last reasoned opinion of the state courts clearly relies on a procedural bar in refusing to consider a claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If a petitioner is guilty of a

procedural default in the state courts, the federal habeas court will only entertain the defaulted issue if petitioner bears the burden of showing cause and prejudice or can show actual innocence.  *Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994).

First, the court must determine whether there are state procedural rules that are applicable to petitioner's claims and whether petitioner failed to comply with the rules.  *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001); *Maupin*, 785 F.2d at 138.  Here, the Michigan Supreme Court rejected petitioner's application for leave to appeal as untimely because it was filed well outside the time period specified by Rule 7.302(C)(2).  That bar applies to all issues raised on direct appeal.  With regard to the issues raised for the first time in petitioner's motion for post-judgment relief, Michigan law erects a bar arising from the failure to raise the issue on direct review.  Rule 6.508(D) of the Michigan Court Rules provides that failure to raise an issue on direct appeal precludes review of that issue on a 6.500 motion in the absence of a showing of cause and prejudice.  Thus, Michigan had specific procedural rules applicable to all grounds raised in the petition and petitioner failed to comply with those rules.

Second, the court must determine whether the state courts actually enforced the rules.  *See Murphy v. Ohio*, 551 F.3d 485, 501-02 (6th Cir. 2009); *Buell*, 274 F.3d at 348.  The federal habeas court must review the last reasoned state-court judgment rejecting petitioner's claim to determine whether the state courts relied upon a procedural bar.  *Ylst*, 501 U.S. at 802-03.  On direct review, the Michigan Supreme Court rejected as untimely petitioner's application for leave to appeal.  On post-judgment review, the Michigan Supreme Court declined to review petitioner's new claims, because petitioner had not raised them in his direct appeal.  It refused to address those claims because petitioner had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  This was a plain statement by the Michigan Supreme Court that its decision rested on a procedural bar.  *See Hargrave-Thomas v. Yukins*,

-37-

374 F.3d 383, 387-88 (6th Cir. 2004); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  The Sixth

Circuit has repeatedly held that Mich. Ct. R. 6.508(D) was firmly established and regularly followed at

least as early as 1990 – more than a decade before petitioner's trial.  *See Simpson v. Jones*, 238 F.3d at 407;

*Luberda v. Trippett*, 211 F.3d 1004, 1008 (6th Cir. 2000); *Jones v. Toombs*, 125 F.3d 945, 947 (6th Cir.

1997).

       The court must also examine the adequacy of the state procedural bar by examining the

substantiality of the state interest involved.  *Wesselman v. Seabold*, 834 F.2d 99, 101 (6th Cir. 1987).  It

is beyond question that the State of Michigan has a substantial interest in preventing untimely and *seriatim*

appellate challenges by prisoners to their criminal convictions.  *See Murray v. Carrier*, 477 U.S. 478, 490-

91 (1986) (State rule requiring all issues to be raised on direct appeal serves "legitimate state interests.").

The state procedural grounds are "adequate and independent."

       "Ordinarily, violation of 'firmly established and regularly followed state rules' will be

adequate to foreclose review of a federal claim.  There are, however, exceptional cases in which exorbitant

application of a generally sound rule renders the state ground inadequate to stop consideration of a federal

question."  *Lee v. Kemna*, 534 U.S. at 375.  This case falls well within the general rule and outside the

narrow exception recognized by the *Kemna* decision.  *See* 534 U.S. at 387 (summarizing the combination

of special circumstances necessary to fall within the "small category" of cases within the narrow exception

to the general rule).

       I find that the State of Michigan had a firmly established rules of procedural bar in place,

that petitioner violated the rules, and that the state court relied upon petitioner's violation of those rules.

Petitioner is therefore barred from maintaining the grounds asserted in the petition, unless he bears the

burden of showing both cause for and prejudice from the procedural default or a fundamental miscarriage of justice.

## I.      Cause and Prejudice

The effect of the procedural bar doctrine is mitigated by the "cause-and-prejudice" rule of *Wainwright v. Sykes*, 433 U.S. 72 (1977).  In that case, the Supreme Court held that when a habeas petitioner can show cause for and prejudice from his state procedural default, the federal courts will entertain his habeas petition regardless of the default.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  The federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation.  *Coleman v. Thompson*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. at 485; *Nields v. Bradshaw*, 482 F.3d 442, 450 (6th Cir. 2007) ("To excuse the default for the purpose of habeas review [the petitioner] must establish both 'cause' and 'prejudice.'"); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006); *Rust v. Zent*, 17 F.3d at 160-61.  If a petitioner cannot establish both cause and prejudice, habeas review is barred, unless he can establish actual innocence.  *Murray*, 477 U.S. at 496.

### A.      <u>Cause</u>

Ineffective assistance of counsel can constitute "cause" in the procedural default context.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *see also Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1376 (2007).  The Supreme Court emphasized in *Edwards v. Carpenter* that not just any deficiency in counsel's performance will suffice to establish cause:

> Although we have not identified with precision exactly what constitutes "cause" to excuse procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing to preserve the claim for review in state court will suffice.  Not just any deficiency in

-39-

counsel's performance will do, however; the assistance must have been so ineffective as to violate
the Federal Constitution. In other words, ineffective assistance adequate to establish cause for the
procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.

*Edwards v. Carpenter*, 529 U.S. at 451-52. Petitioner's present counsel argues in cursory fashion in her

reply brief that "ineffective assistance of trial and appellate counsel establish[] cause to excuse [the]

procedural default[s]. (Reply Brief at 2, docket # 32). The brief and reply brief offer no explanation how

purported ineffective assistance of trial counsel would excuse petitioner's failure to file a timely application

for leave to appeal to the Michigan Supreme Court and his failure to raise issues in his direct appeal as of

right to the Michigan Court of Appeals. Habeas counsel's statement that, "Ineffective Assistance is listed

in many of the issues presented and this argument takes up a large portion of Petitioner's Brief" (Reply

Brief at 2), is patently insufficient to carry petitioner's burden of demonstrating cause to excuse petitioner's

procedural defaults.

Petitioners' argument that ineffective assistance of appellate counsel constitutes cause to

excuse his procedural defaults fares no better. Ineffective assistance of appellate counsel "may constitute

cause for procedural default, but only if it is constitutionally ineffective under the standard established in

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *Howard v. Bouchard*,

405 F.3d 459, 478 (6th Cir. 2005) (citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). To establish

ineffective assistance of counsel, the petitioner must demonstrate: (1) counsel's performance fell below

an objective standard of reasonableness and was not sound legal strategy; and (2) counsel's deficient

performance prejudiced petitioner resulting in an unreliable or fundamentally unfair outcome. *Strickland

v. Washington*, 466 U.S. at 687-88. The Court indulges in "a strong presumption that counsel's conduct

falls within the wide range of reasonable profession conduct." *Id.* at 687. As for prejudice under Sixth

Amendment standards, the court focuses on whether "counsel's deficient performance renders the result

-40-

of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

        1.      Untimely Application for Discretionary Review by Michigan's Supreme Court

        Petitioner argues that deficiencies in appellate counsel's representation of petitioner after the Michigan Court of Appeals had rendered its decision, such as a delay of "several days" in petitioner's receipt of the decision of the Court of Appeals because counsel sent a copy of the opinion to the wrong prison (Petitioner's Brief at 36, 42, 46-47, docket # 2). These allegations cannot provide the requisite "cause" to excuse petitioner's procedural default in failing to file a timely application for review by the Michigan Supreme Court. Review by the Michigan Supreme Court is discretionary. *See* MICH. CT. R. 7.301(A); *see also Daniels v. Burke*, 83 F.3d 760, 762 (6th Cir. 1996). "[T]he right to appointed counsel extends to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Petitioner did not have a Sixth Amendment right to counsel in connection with his application for discretionary review by the Michigan Supreme Court. In *Wainwright v. Torna*, 455 U.S. 586 (1982), the Supreme Court addressed the issue of whether the Sixth Amendment right to counsel extended to discretionary review of criminal convictions by a state's supreme court. The Florida Supreme Court had rejected as untimely Torna's application for a writ of certiorari to the Florida Supreme Court. Torna's federal habeas corpus petition claimed that his Sixth Amendment right to the effective assistance of counsel had been violated when his counsel failed to file a timely application for *certiorari*. The Supreme Court held that Torna did not have the constitutional right to counsel with regard to discretionary state-court appeals. The Court concluded that, "Since respondent had no constitutional right to counsel, he

could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."  455 U.S. at 588.  On the same basis, petitioner cannot base a Sixth Amendment violation on an alleged errors of Attorney Van Eck in connection with petitioner's application for discretionary review in the Michigan Supreme Court.  *Id.*; *see Halbert v. Michigan*, 545 U.S. 605, 628 (2005); *Scuba v. Brigano*, 527 F.3d 479, 489 (6th Cir. 2007).  As appointed appellate counsel, Mr. Van Eck had a duty to apprise petitioner of the state Court of Appeals decision within a reasonable time.  A delay of a "few days" stemming from sending the opinion to the wrong prison cannot possibly be deemed ineffective assistance of counsel, as such a trivial mistake is neither objectively unreasonable nor prejudicial.  After petitioner had actual knowledge of the decision of the Court of Appeals, any failure to seek discretionary review in the state Supreme Court was petitioner's responsibility alone.  Furthermore, Mr. Van Eck expressly informed petitioner of his need to act, in time for him to file a *pro se* application, had he been diligent.  Petitioner cannot show cause for his appellate default by any act or omission of his appellate counsel.

### 2. Failure to Raise Additional Issues on Direct Appeal

The Michigan courts refused to consider claims on post-conviction review that petitioner could have raised on direct appeal.  The Sixth Circuit has recognized that a Michigan defendant's failure to raise an issue on direct appeal is a procedural default that bars presentation of the claim on habeas review, absent a showing of cause and prejudice.  *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387-88 (6th Cir. 2004).  Petitioner asserts that ineffective assistance of appellate counsel provides cause to excuse this procedural default.  Petitioner's arguments that his appellate counsel should have raised additional issues in the  Michigan Court of Appeals falls short of establishing cause to excuse petitioner's procedural

defaults.  Claims of ineffective assistance of appellate counsel are measured under the *Strickland* standard.

*Evitts v. Lucey*, 469 U.S. 387 (1985).  Petitioner must prove (1) that appellate counsel's performance fell

below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced

defendant resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687-88.  In adjudicating

the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct

on the facts of the particular case, viewed as of the time of counsel's conduct.  The court should recognize

that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions

in the exercise of reasonable professional judgment."  *Id.*  The Sixth Amendment is violated only if

counsel's acts or omissions "were outside the wide range of professionally competent assistance."  *Id.*

Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually

unchallengeable."  466 U.S. at 690.  In the case of appellate counsel, petitioner has no constitutional right

to have had every nonfrivolous issue raised on appeal.  *Jones v. Barnes*, 463 U.S. 745 (1983).  Tactical

choices regarding issues on appeal are properly left to the sound judgment of counsel.  *See United States

v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  "'Winnowing out weaker arguments on appeal and focusing on'

those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate

advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. at 751-52)).

Petitioner's appellate counsel raised four issues on direct appeal: (1) whether petitioner's

Sixth Amendment rights under the Confrontation Clause had been violated by the admission of Weldon

Mosby's statement to the police; (2) whether petitioner's counsel rendered ineffective assistance during

the hearing on petitioner's motion to suppress Mosby's statement; (3) whether pretrial publicity had

deprived petitioner of a fair trial and whether trial counsel had been ineffective for failure to move for a

change of venue; and (4) whether prosecutorial misconduct of improperly bolstering of Carla Ringleka's

credibility through reference to her prior consistent statement had deprived petitioner of a fair trial. Petitioner argues that appellate counsel was constitutionally ineffective because he failed to raise additional claims challenging the effectiveness of trial counsel.   He argues that Attorney O'Connell was constitutionally ineffective in his investigation and preparation of petitioner's defense because trial counsel "failed to investigate the circumstances surrounding the arrest of Jerome Gass in Ingham [C]ounty to discover when Gass gave his statement and what he knew before he did so" and failed to act with sufficient diligence to discover Gass's criminal record; failed to cross-examine Jerome Gass; failed to recall Gass as a witness after Joseph Housman had testified; gave a "rambling" closing argument; and failed to object to purported "mischaracterizations" of the evidence in the prosecutor's closing argument.  (Petitioner's Brief at 31-42, 44-46, 52-54; Reply Brief at 2-3).[10]

Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  Here, the issues raised by appellate counsel had a far better chance of success than the grounds petitioner now claims were unconstitutionally omitted. For the reasons set forth below, I find no constitutional error by appellate counsel.

---

[10]Petitioner's brief contains passing arguments that appellate counsel was ineffective because he  "fail[ed] to discredit the testimony of Gass in the original brief on appeal" (Petitioner's Brief at 31) and that appellate counsel's statement of facts was too short.  (*Id.* at 34).  Neither argument is worthy of extended discussion.  The jury, not the court of appeals, made the credibility determination regarding Jerome Gass's testimony.  Further, the forty-one page brief Attorney Van Eck filed on petitioner's behalf more than adequately presented the relevant facts to the Michigan Court of Appeals.

Petitioner argues that his trial counsel's investigation, preparation, and cross-examination of Jerome Gass were constitutionally ineffective because O'Connell purportedly did not adequately cross-examine Jerome Gass with regard to his history of criminal convictions. Petitioner argues that, "Gass had been convicted of numerous crimes, including robbery. However, trial counsel never obtained this information, which was easily accessible from the MDOC website, and never asked for a recess or recalled Gass to set this out for the jury." (Petitioner's Brief at 34). There was no error, much less an error of constitutional dimension. Ordinarily, evidence that a witness has been convicted of a crime is not admissible for the purpose of attacking the witnesses's credibility. *See* MICH. R. EVID. 609(a); *People v. Allen*, 420 N.W.2d 499, 522 (Mich. 1988). Unlike federal law, Michigan law allows impeachment by convictions only if the crime contained an element of dishonesty or theft. MICH. R. EVID. 609(a)(2). The MDOC records cited by petitioner show that Gass's robbery conviction occurred in 1982, two decades before petitioner's trial. Robbery does contain an element of theft, but is essentially an assaultive crime, and so has a relatively lower probative value. *Allen*, 420 N.W.2d at 524. In addition, the conviction was quite old. "Evidence of a conviction is not admissible if a period of more than ten years has elapsed since the date of conviction or of the release of the witness from confinement imposed for that conviction, whichever is the later date." MICH. R. EVID. 609(c). MDOC records indicate that Jerome Gass was discharged from his robbery sentence on February 2, 1992, nine years and three months before petitioner's trial. Thus, the remote nature of the robbery conviction alone did not make it impossible for trial counsel to use this conviction for purposes of impeachment. However, under Rule 609(a)(2)(B), trial counsel had the burden of proving that this 1982 conviction had "significant probative value on the issue of credibility." "For purposes of the probative value determination required by subrule (a)(2)(B), the court shall consider only the age of the conviction and the degree to which a conviction of the crime is indicative of veracity."

Mich. R. Evid. 609(b).  Given the age of the offense and its low probative value, the trial court would likely not have allowed it into evidence.  Further, trial counsel did not prejudice petitioner in failing to impeach Gass with his old robbery conviction.  During cross-examination, Attorney O'Connell was able to get Jerome Gass to admit that he had been convicted of "crimes" involving theft or dishonesty.  (TT II, 163).  The impeachment occurred.  More specificity would have only highlighted the age of the conviction.[11]

Petitioner's argument that trial counsel was constitutionally ineffective for failure to recall Gass as a witness after Montcalm County jail inmate Joseph Housman had testified (Petitioner's Brief at 34) requires little discussion, because it was an obvious strategic choice made by Attorney O'Connell. O'Connell called Houseman to testify regarding statements Gass purportedly made in jail, tending to exonerate petitioner.  Because Houseman testified after Jerome Gass, Gass had no opportunity to refute what Houseman claimed he had said.  Recalling Gass would have been a blunder.  Any benefit petitioner could hope to gain by recalling Gass was far outweighed by the risk that Gass would answer and perhaps seriously undermine Houseman's testimony.

Petitioner's criticism that Attorney O'Connell's closing argument was rambling and failed to adequately highlight Jerome Gass's reasons for shifting blame to petitioner (Petitioner's Brief at 34) simply cannot withstand scrutiny.  Attorney O'Connell's closing argument continued the defense's theory that petitioner and Jerome Gass were the "fall guys" (TT III, 53-55, 68, 69, 79, 83).  He responded to the prosecutor's arguments.  He argued that Carla Ringleka and Weldon Mosby had long been scheming to

---

[11] In a related argument, petitioner's present attorney faults trial counsel for failure to impeach Gass with the fact of "pending felony charges."  (Reply Brief at 3).  Counsel cites no authority supporting a conclusion that the fact of pending, unproven charges would be admissible for impeachment.  This argument is utterly frivolous and falls below counsel's duty of professional responsibility to this court.

kill Howard Ringleka, and part of their plan was to get Gass and petitioner drunk, leave them in the car, and have them available to take the blame for the killing if they were caught. (TT III, 79, 83). He argued that Mosby killed Howard Ringleka with an ax and made the murder look like it had taken place during a robbery. Attorney O'Connell argued that Jerome Gass was a desperate and incredible witness. (TT III, 75). Gass was very sick and had been removed from the kidney transplant list and needed to make a deal with the prosecutor. (TT III, 77, 80). Gass blamed petitioner because petitioner's statement had implicated Gass in the killing of Howard Ringleka. (TT III, 82). Defense counsel's closing argument did not fall below an objective standard of reasonableness. Appellate counsel cannot be faulted for failure to assert this patently meritless claim.

Petitioner has not shown that any of the purported errors by his trial and appellate counsel resulted in an unreliable or fundamentally unfair outcome. Thus, there is no basis for a finding of prejudice under the second prong of the *Strickland* standard.

In summary, I find that none of the purported instances of ineffective assistance of counsel provide cause to excuse petitioner's procedural default.

B.    Prejudice

I find that petitioner has failed to establish prejudice under the "cause and prejudice" standard. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008) (citing *United States v. Frady*, 456 U.S. 152, 170-71 (1982)). "'[T]he prejudice component of the cause and prejudice test is not satisfied

if there is strong evidence of petitioner's guilt and a lack of evidence to support his claim.'"  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *Rust v. Zent*, 17 F.3d at 161-62).  In this case, there is overwhelming evidence of petitioner's guilt.

   None of the grounds raised by petitioner provides a basis for a finding of prejudice.

   1.   Confrontation Clause  (Ground I)

   In Ground I, petitioner claims a violation of his rights under the Sixth Amendment's Confrontation Clause.[12]   The Sixth Amendment's Confrontation Clause states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  In general, the introduction of out-of-court statements by declarants who do not testify at trial can violate Confrontation Clause rights, if the statements are admitted for the truth of the matter asserted.  *See Lee v. Illinois*, 476 U.S. 530, 539 (1986).  At the time of petitioner's trial in 2001, Confrontation Clause analysis of hearsay statements was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980), under which the prosecution bore the burden of showing that the declarant was unavailable and that the statement bore adequate indicia of reliability.  A statement was considered to have sufficient indicia of reliability if it either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."  448 U.S. at 66.[13]

---

   [12] The series of ineffective assistance of trial and appellate counsel claims appearing in this section of petitioner's brief (docket # 2 at 30-40) was addressed and rejected within the discussion of cause under the cause and prejudice test.

   [13] On March 8, 2004, long after petitioner's conviction became final, the Supreme Court issued its decision in *Crawford v. Washington*, 541 U.S. 36 (2004).  *Crawford* introduced a fundamental change in Confrontation Clause analysis.  In *Crawford*, the Court held that testimonial, out-of-court statements offered against the accused to establish the truth of the matter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant.  Under *Crawford*, reliability is no longer the test.  541

The Michigan Court of Appeals observed that Weldon Mosby's taped statement was not admitted at trial.  "Rather, Detective Lieutenant Joe Patino, one of the officers who took Mosby's statement, related portions of Mosby's statement during his testimony at trial."  (Op. at 1).  The Court of Appeals held that this evidence should not have been admitted as a statement made against the declarant's penal interest under Rule 804(b)(3) of the Michigan Rules of Evidence.  The Court of Appeals, citing the Michigan Supreme Court's decision in *People v. Poole*, 506 N.W.2d 505, 511 (Mich. 1993), which in turn cited *Ohio v. Roberts*, held that Weldon Mosby's statement did not bear sufficient indicia of reliability to be admitted as evidence against petitioner under the Confrontation Clause.  (Op. at 2).  The Michigan Court of Appeals, applying the standard established by the Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967), went on to hold that this error was harmless beyond a reasonable doubt, in light of the totality of the evidence produced against petitioner at trial.  (Op. at 2-3).  The testimony of Jerome Gass and petitioner alone "established [petitioner's] guilt independent of Patino's testimony of Mosby's statement."  (Op. at 3).  The state court's determination that the Confrontation Clause violation was harmless was not an objectively unreasonable application of clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  On page 31 of his brief, petitioner "submits that the Court of Appeals erred when it found that the error was harmless."  (Petitioner's Brief at 31).  This falls far short of satisfying petitioner's burden under AEDPA of demonstrating that the finding of harmless error by the Michigan Court of Appeals was objectively unreasonable.

---

U.S. at 60-61.  The Supreme Court has since definitively held that the new rule that it announced in *Crawford* does not apply retroactively to cases on collateral review.  *See Whorton v. Bockting*, 127 S. Ct. 1173 (2007); *see also Vasquez v. Jones*, 496 F.3d 564, 568 n. 1 (6th Cir. 2007) (*Whorton v. Bockting* "forecloses the argument" that *Crawford* should be applied retroactively).

A violation of the Confrontation Clause is subject to harmless error analysis. *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986); *Hill v. Brigano*, 199 F.3d 833, 846-47 (6th Cir. 1999).  In *Mitchell v. Esparaza*, 540 U.S. 12, 17-18 (2003), the Supreme Court held that when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under section 2254 unless the harmlessness determination itself is unreasonable.  In *Fry v. Pliler*, 127 S. Ct. 112 (2007), the Supreme Court resolved the issue of whether a federal court conducting habeas review under AEDPA is required to apply the *Chapman* standard or the less demanding harmless error standard established by the Supreme Court in *Brecht v. Abrahamson*:

> In *Chapman*, *supra*, a case that reached this Court *on direct review* of a state-court criminal judgment, we held that a federal constitutional error can be considered harmless only if a court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Id.*, at 24, 87 S.Ct. 824. In *Brecht*, *supra*, we considered whether the *Chapman* standard of review applies on collateral review of a state-court criminal judgment under 28 U.S.C. § 2254. Citing concerns about finality, comity, and federalism, we rejected the *Chapman* standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).  Under that standard, an error is harmless unless it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, *supra*, at 631, 113 S.Ct. 1710 (quoting *Kotteakos*, *supra*, at 776, 66 S.Ct. 1239).

*Fry v. Pliler*, 127 S. Ct. at 2325.  In *Fry*, the Court held that, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*."  127 S. Ct. at 2328 (citations omitted).

Here, Mosby's statements introduced through Detective Patino were, at most, cumulative. The other evidence of petitioner's guilt was exceedingly strong.  (Op. at 2-3).  Under the *Brecht* standard, admission of the hearsay statements found in Detective Patino's testimony must be deemed harmless error.

*See Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) (admission of hearsay evidence was at best harmless because it was cumulative of other evidence); *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999) (where majority of information already before the jury and the evidence of guilt was strong, Confrontation Clause error was harmless).  The decision of the Michigan Court of Appeals finding harmless error under the *Chapman* standard cannot be deemed contrary to or an unreasonable application of clearly established Supreme Court authority.  Petitioner's Confrontation Clause challenge must therefore fail.

> 2.    Ineffective Assistance of Counsel During the Hearing on a Motion to Suppress Weldon Mosby's Statement (Ground II)

Ground II is a related argument that petitioner's Sixth Amendment rights were violated at the April 16, 2001 pretrial hearing on his motion to suppress when Attorney Novelli primarily relied on the arguments appearing in the brief filed on petitioner's behalf in advance of the hearing.  Petitioner argues that Attorney Novelli was constitutionally ineffective because he was "inadequately prepared and failed to make vigorous arguments."[14] (Petitioner's Brief at 40).  The Michigan Court of Appeals, applying the constitutional standard established by the Supreme Court in *Strickland*, rejected this claim.  (Op. at 3).  Although petitioner faced a significant hurdle under the *Strickland* standard in state court on his claims of ineffective assistance of counsel, he now faces an even higher hurdle under AEDPA standards:

> To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  *Strickland* requires that reviewing courts be highly deferential of counsel's performance.  *Id.* at 689, 104 S.Ct. 2052.  Counsel renders ineffective assistance

---

[14]Petitioner does not identify any specific argument that was not presented to Judge Meil in writing under the Confrontation Clause standards then in effect.  He ignores the fact that two other attorneys who represented petitioner, Attorney Simon at the November 10, 2000 preliminary examination hearing (PE, 66-88, docket # 16), and Attorney O'Connell at trial on April 30, 2001 (TT I, 71, docket # 18), were also unsuccessful in persuading state-court judges that Mosby's statement should be suppressed.

when his performance "f[alls] below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, but there is a "strong presumption" that counsel's performance was professionally reasonable, *id.* at 689, 104 S.Ct. 2052.  Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.  Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:

> For [a petitioner] to succeed, ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  Rather, he must show that the [state] Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

*Carter v. Mitchell*,  443 F.3d 517, 525 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 955 (2007) (quoting *Bell v. Cone*, 535 U.S. 685, 698-99 (2002)).  Petitioner has not demonstrated that the finding of no Sixth Amendment violation by the Michigan Court of Appeals was objectively unreasonable.  28 U.S.C. § 2254(d)(1).  Counsel's briefs made all the right arguments, which the trial judge was forced to address.  The error was that of the judge, not counsel.

> 3.    Ineffective Assistance of Counsel in Failure to Move for a Change of Venue (Ground III)

In Ground III, petitioner argues that trial counsel was constitutionally ineffective for failure to file a motion for a change of venue.  (Petitioner's Brief at 43-45).  The Michigan Court of Appeals, applying the *Strickland* standard, found no merit in this argument on either the performance or prejudice prongs.  The appellate court found no substantial basis for such a motion.  The newspaper coverage "accurately and objectively related events surrounding the victim's death and subsequent investigation and trials." (Op. at 4).  Pretrial publicity did not saturate the community such that  it tainted the jury pool.

(*Id.*).  A motion for a change of venue "would not have been successful" and defense counsel was not required "to make motions that ha[d] no merit."  (*Id.*).  Petitioner's brief fails to engage these factual and legal determinations by the Michigan Court of Appeals.  The finding of the Michigan Court of Appeals easily passes review under deferential AEDPA standards.

Ground III includes a new claim of ineffective assistance of counsel that was never raised on direct appeal.  Petitioner argues that trial counsel was ineffective for failure to "ensure that no members of the jury had read about the case in the newspaper."  (Statement of Questions Presented, Petitioner's Brief at ix, docket # 2).  Petitioner contends that counsel was constitutionally ineffective because he did not exercise peremptory challenges against two jurors who indicated that they had read about the case, but had not reached any conclusions about petitioner's guilt or innocence.  (Petitioner's Brief at 44)(citing TT I, 55, 61).  There is no evidence that either juror was in any way biased against petitioner.  Petitioner cites no authority for the proposition counsel must exercise peremptory challenges under such circumstances.  Petitioner has not shown that counsel's performance fell below an objective standard of reasonableness or a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.

4.      Prosecutorial Misconduct in the Direct Examination of Carla Ringleka  (Ground IV)

In Ground IV, petitioner claims prosecutorial misconduct occurred in the direct examination of Carla Ringleka, depriving him of a fundamentally fair trial.  On habeas corpus review, claims of prosecutorial misconduct are reviewed deferentially.  *See Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S.

168, 181 (1986). "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008)(quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

The first question for the habeas court is whether the prosecutor's statement was misconduct at all. *West v. Bell*, 550 F.3d at 566; *see Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005). If so, the court is to examine four factors in determining whether the impropriety was "flagrant": (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *West v. Bell*, 550 F.3d at 566; *see Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under AEDPA, this bar is heightened by the deference that the habeas court must give to the findings of the State's courts on petitioner's prosecutorial misconduct claim. *Bowling*, 344 F.3d at 513.

Under the foregoing authorities, the first issue is whether the conduct complained of was improper. Petitioner's argument that Prosecutor Andrea Krause improperly bolstered the testimony of Carla Ringleka by asking her whether she had changed her story after entering into her plea agreement fails to clear this initial hurdle. The Michigan Court of Appeals held that there was no prosecutorial misconduct, or due-process violation and that Ringleka's testimony was properly admitted under Rule 801(d)(1)(B) of the Michigan Rules of Evidence. (Op. at 4-5). The question posed to Carla Ringleka

-54-

regarding her earlier statement came in response to defense counsel's opening statement that Ringleka had been motivated to lie in order to get a favorable plea agreement from the prosecutor. (Op. at 5). The findings that there was no prosecutorial misconduct and that petitioner was not deprived of a fundamentally fair trial easily past muster under deferential AEDPA standards.

Petitioner's continued disagreement with the state court's evidentiary ruling does not provide a basis for habeas corpus relief. The extraordinary remedy of habeas corpus lies only for a violation of the federal Constitution or laws. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1704 (2008); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Bey*, 500 F.3d at 521; *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may only grant relief if a petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Bey*, 500 F.3d at 521-22; *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

-55-

Petitioner has not met this difficult standard.  Rule 801(d)(1)(B) of the Michigan Rules of Evidence provides that a prior statement of a witness is not hearsay if the declarant testifies at trial, the statement is consistent with the declarant's testimony, and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.  MICH. R. EVID. 801(d)(1)(B). This rule is patterned after Rule 801(d)(1)(B) of the Federal Rules of Evidence.  Although the Supreme Court has addressed whether prior consistent statements are admissible under the Federal Rules of Evidence, *see e.g.*, *Tome v. United States*, 513 U.S. 150, 156-67 (1995), it has not addressed the issue in constitutional terms.  There is no clearly established Supreme Court precedent which holds that it is a violation of due process to question a witness about a prior consistent statement after the defendant's opening statement has opened the door by suggesting that the witness was motivated to lie to get a plea agreement from the prosecutor.  Furthermore, the question was isolated and not prejudicial.   The prosecutor's questioning comes nowhere near a constitutional violation.

5.     Prosecutorial Misconduct in Closing Argument  (Ground IV)

In Ground V, petitioner claims that there were numerous instances of prosecutorial misconduct in the prosecutor's closing argument which deprived him of a fundamentally fair trial.  These claims were never  raised in petitioner's appeal as of right and were found to have been procedurally defaulted on that basis.  Every claim of prosecutorial misconduct that petitioner is now attempting to assert is barred by a second layer of procedural default because no contemporaneous objections were made to any portion of the prosecutor's closing argument.  Assuming *arguendo* that these claims were not barred by multiple layers of procedural default, I find that they are patently meritless.

-56-

The alleged prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. at 181, and the initial question is whether the prosecutor's argument was misconduct at all. *West v. Bell*, 550 F.3d at 565. I find that none of the prosecutor's purportedly offending arguments constituted prosecutorial misconduct, much less that her arguments rose to the level of depriving petitioner of a fundamentally fair trial.

(a).    Petitioner's Opportunity to Tailor his Testimony

First, petitioner argues that the prosecutor's arguments that he had the opportunity to listen to other witnesses during his trial, and then tailor his own testimony accordingly, were improper. Petitioner's Brief at 49-50)(citing TT III 37, 47).  The Supreme Court flatly rejected an identical argument in *Portundo v. Agard*, 529 U.S. 61 (2000).  It is not error for a prosecutor's argument to call the jury's attention to the fact that unlike other witnesses, the defendant had the opportunity to hear all other witnesses testify and tailor his own testimony accordingly:

> In sum, we see no reason to depart from the practice of treating testifying defendants the same as other witnesses.  A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening.  Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate-and indeed, given the inability to sequester the defendant, sometimes essential-to the central function of the trial, which is to discover the truth.

529 U.S. at 73.  No prosecutorial misconduct occurred.

(b).    Weldon Mosby's Ability to Wield an Ax

Next, petitioner argues that the prosecutor improperly argued that Weldon Mosby would not have been able to wield the ax and kill Howard Ringleka.  (Petitioner's Brief at 50) (citing TT III, 44-45).  The trial transcript shows that the prosecutor reminded the jury of Dr. Cohle's testimony regarding

-57-

the numerous ax wounds the victim suffered and how it would have likely taken an adult male with a significant amount of strength to have inflicted those wounds.  She showed the jury the murder weapon and remarked that jurors would have their own opportunity in the jury room to feel the weight of the weapon.  She reminded the jury of Bobbi Lake's testimony that shortly before December 4, 1999, Weldon Mosby had surgery in the left lower groin,  that it caused him pain, and that she could tell it was sore when Mosby walked.  (TT I, 133-34).  The prosecutor then asked the jury to consider whether a man who had recently had surgery could swing the ax and deliver the number of blows that the victim suffered:

> Dr. Cohle said an adult male with a lot of force would have to swing this ax down.  The blows came from a downward motion with a lot of force to cause the injuries on Howard Ringleka, not someone who just had surgery, like Weldon Mosby.  Bobbie Lake testified that he had just had surgery prior to December 4th, he was in a lot of pain.  He had a lump removed from his groin area. Do you think that he could have swung this ax that many times, having just had that surgery?  Do you think Weldon Mosby all of a sudden developed this incredible courage to take an ax to Howard Ringleka when he couldn't take a gun to a sleeping guy.  This guy was no small individual as you can see by those pictures, and see the picture of him in the bathroom lying dead.  Weldon Mosby all of a sudden developed this incredible courage, ladies and gentlemen, according to the Defendant, to take this ax on the guy who is alive and not sleeping, somebody who would fight back, having just had surgery, when he couldn't pull a shotgun trigger on a sleeping man. Incredible.

(TT III, 44-45, docket # 21).  The prosecutor's argument was well-supported by the evidence and was entirely appropriate  A prosecutor is allowed to argue facts in the record, highlight inconsistencies or inadequacies in the defense, and forcefully assert reasonable inferences from the evidence.  *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008).  The prosecutor's arguments fell within these constitutional boundaries.

(c).    Gass Didn't Have an Opportunity to Read the Statements of Other Defendants

Petitioner argues, "Finally, and most egregiously, the prosecutor stated at the end of her argument that the jury should believe Jerome Gass because, 'He didn't read anybody's statement before giving his.'" (Petitioner's Brief at 50)(citing TT III, 49).  This argument is continued on page fifty-one of petitioner's brief where he states, "Finally, and most damaging to Petitioner, is the prosecutor's comment that Gass did not read anyone's statement before he made his statement and for this reason he should be believed.  It may have been true that Gass did not *read* anyone's statement, but Gass definitely knew about McMurtry's statement, and probably Mosby's, and Patino admitted that he led Gass to believe that McMurtry had implicated him."  (Petitioner's Brief at 51)(emphasis in original).  The challenged portion of the prosecutor's closing argument is quoted in context below:

> To summarize why you shouldn't believe the Defendant's version that Mosby again was the killer, he had surgery, he couldn't shoot a sleeping man, but yet confronted him with an ax when he was not sleeping.  There's the DNA, the physical evidence, the blood, the DNA, nothing on the driver's side of that vehicle.  Wouldn't it be easier -- when all these people are making their statements and whatnot -- who is it easier to blame, a friend or somebody that you don't even know?  Wouldn't [it] have been easier for Gass to say, oh gosh, Mosby did it, I didn't know him, so Mosby did it?  He didn't do that.  We know that Mosby and the Defendant were friends, and that Mosby and Gass didn't know each other before December 4th.

> Why should you believe Jerome Gass.  He didn't read anybody's statement before giving his.  It was consistent with what he testified to yesterday.  It was corroborated by Carla Ringleka, by Weldon Mosby.  He is corroborated by the DNA evidence, the ax evidence, which he didn't even know about the ax.  He had to only have heard it because they were discussing it in the car.  He didn't have any motive.  He had no motive whatsoever to do this killing.

> Why should you believe that the Defendant did do it?  He had the motivation to lie.  He wants you to believe that Gass is a liar because he had a chance to read McMurtry's statement, and because McMurtry mentioned Gass's name one hundred and ten times, he blames McMurtry for the killing.  Well didn't McMurtry have a chance to read Mosby's statement and tailor his statement?  Isn't that motivation to lie also?  Do you want to use that same scenario on one person.  The Defendant wants his cake and to eat it too, so to speak.  It's hard to be a consistent liar.  Look at -- McMurtry had all of these opportunities to tell you what happened, and he still didn't get it right.

The order of stops he didn't get right, the amount of money he borrowed he didn't get right.  The flashed headlights, he never said that once before.  He again tailored his statement during this trial because of what he already heard.  He never said that anywhere else, and is drugged [sic] at the motive.  He said there was no big deal.  It must have been a big deal, and even if it was only fifty or seventy-five bucks, because he was carrying a weapon and he was worried about this guy.  The DNA matches where he says he was sitting in the car.  His size is consistent with the force necessary that would have been taken to swing this ax to perform this killing of Howard Ringleka.  He had been told by Weldon Mosby what the score was before they ever left Detroit.  Don't tell me but that this guy came into this area without knowing what was going to happen.

Ladies and gentlemen, I would ask that you find the defendant guilty of all charges.  Thank you.

(TT III, 49-50).  There was nothing improper in the prosecutor's argument that Jerome Gass did not read anyone else's statement before making his statement to the police.

### (d).    Bolstering in the Prosecutor's Rebuttal Argument

Petitioner argues that the prosecutor's rebuttal argument "flagrantly bolstered" Carla Ringleka's testimony.  (Petitioner's Brief at 50) (citing TT III, 89-90, 93).  A review of the trial transcript reveals that there was nothing improper in Attorney Krause's rebuttal to defense counsel's closing argument.  Vouching for the witness occurs when the prosecutor improperly puts the government's prestige behind a witness, generally by asking the jury to believe the witness, because the prosecutor does.  *See, e.g., United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004).  A second impermissible species of argument, called bolstering, occurs when the prosecutor invites the jury to believe that there is other evidence, known only to the prosecutor, justifying the prosecutor's belief in the witness's credibility.  *United States v. Owens*, 426 F.3d 800, 807 (6th Cir. 2005).  Neither principle forbids a prosecutor from making reasonable arguments as to witness credibility on the basis of the evidence.  *Green v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001).  The prosecutor's comments on credibility did not ask the jury to believe her witness because she believed them, nor were they based on secret evidence.  No misconduct occurred.

-60-

5.      Cumulative Effect (Ground VI)

In Ground VI, petitioner argues that the "cumulative effect" of errors deprived petitioner of a fair trial.  Such catch-all "cumulative effect" arguments are common in habeas corpus petitions and are ineffectual as grounds for habeas corpus relief under AEDPA standards.  In *Millander v. Adams*, 376 F.3d 570 (6th Cir. 2004), the Sixth Circuit succinctly dispatched a "cumulative effect" argument by a habeas corpus petitioner in these terms:

> As a final argument to support habeas relief, Mr. Millender argues that the cumulative effect of the alleged errors he presents supports granting relief.  In addition to finding no errors to consider even if such a task were within this Court's province, we reiterate that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."

*Millender*, 376 F.3d at 529 (quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)); *see Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006).  Ground VI does not provide basis for granting petitioner's request for habeas corpus relief.

In summary, I find neither cause nor prejudice to excuse petitioner's procedural defaults.  Alternatively, I find that all grounds raised in the petition are meritless and do not provide grounds for granting petitioner's request for habeas corpus relief.

## III.    Miscarriage of Justice

As a final step in the procedural default analysis with regard to petitioner's defaulted claims is whether lack of habeas review will result in a "fundamental miscarriage of justice."  *See House v. Bell*, 547 U.S. 518, 536 (2006).  The Supreme Court has commented that this exception is "rare" and should only be applied in "an extraordinary case."  *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see House*, 547 U.S. at 538.  "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond

-61-

a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327). To meet this standard, a petitioner must present "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has not carried this burden. His reply brief asserts only that he passed a polygraph test. This bit of inadmissible information falls far short of the "new reliable evidence" required by Supreme Court precedent. *See Hatch v. Lambert*, 215 F. App'x 614 (9th Cir. 2006) (polygraph test not "reliable evidence" for purposes of showing actual innocence); *Glenn v. Scutt*, No. 07-15477, 2008 WL 5191506 at * 2 (E.D. Mich. Dec. 10, 2008) (same).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:   March 17, 2009                         /s/  Joseph G. Scoville
                                                United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).